Attorney General representing the State of Alaska. I have blow-ups of a couple of the maps in the excerpt of the record, which I think would be helpful. I don't know exactly where to set them up here. That's the problem when you're in a district court. They never have provisions for trial exhibits. You can just stick that up on the chair. We do have, I think you provided those in the record. If you prop them up on the chair, everybody can probably see them. Let's get to the argument. Why don't you put them over by the chair, and when you need to refer to them, just pick them up and point them out to us. We'll call this the moose use case, okay? Well enough, Your Honor. As I stated before the argument began, my name is Mike Serag, Assistant Attorney General representing the Appellant of the State of Alaska. May it please the Court, this is a case in which quite simply, the Federal Subsistence Board and the Secretaries of Interior and Agriculture did not follow their own standards and regulations. As a result, they erroneously granted priority to hunt moose to Chister Chena's 100 or so residents under much more liberal federal subsistence harvest regulations than the state regulations, throughout an area seven times greater than the relevant evidence could possibly support. The federal subsistence priority in Alaska, as set up and implemented by the federal defendants, depends upon the establishment of local harvest areas known as C&T determinations. Only a local rural community which demonstrates previous customary and traditional harvest of a specific wildlife population within a nearby area is supposed to receive a C&T determination to harvest that population within that area under the federal subsistence regulations. By federal rules, C&T determinations are exclusive in nature. Once a community is granted a C&T determination to harvest a specific wildlife resource within a specific area, all other unlisted rural communities and residents, as well as the general citizenry, are precluded from hunting that resource in that area pursuant to the federal subsistence laws. As detailed in the state's briefs, the most of the evidence presented to the federal subsistence board could possibly support an area previously hunted by any Chistochina residents or their recent ancestors within Game Management Unit 12, which is the unit at issue, was 2,500 square miles. The residents of Chistochina already have a C&T determination for many years to preferentially harvest moose within a 1,333 square mile area of Game Management Unit 12. Can I just go back? I want to make sure I understood what you were saying. If you get designation within an area, is to the exclusion of anybody else? Yes, Your Honor. As to those communities not listed, including those rural communities, they are excluded from hunting moose in that area under the federal subsistence laws, and I mean under the federal subsistence harvest regulations. You mean just hunting for subsistence? I didn't... It only governs subsistence hunting. It doesn't govern other kinds of hunting. That's... For instance, sport hunting. That's still governed by other regulations, isn't it? That is governed by other regulations, and the same with the state's subsistence program. That's what Judge Fischer was getting at. It doesn't exclude everybody. It doesn't. Here's the practical result. The federal subsistence harvest regulations are generally far more liberal with longer periods of harvest, and in this case the harvest of any antlered moose as opposed to moose of a certain size, just a restricted size. And as happened in this case, when there is a C&T granted, it does impact the harvest under the state regulations because the state has to take into consideration that additional harvest, in this case by 100 or up to 100 residents, which is the gene. But no, it doesn't... people from hunting within the area under the state regulations. Okay. In the board's present regulatory action, the one being challenged, new evidence was submitted of four old seasonal sites spread out over an area of almost 1,200 square miles at which it was understood ancestors of some Chistochina residents hunted moose. That area was adjacent to and partly overlapped the pre-existing 1,333 square mile area. Based on this marginal additional evidence of four old sites, the federal government awarded the entire community of Chistochina an additional C&T preference to take moose, not just within that additional 1,200 square miles. It did so throughout the entire remaining 8,700 square mile area of GMU-12, which totals 10,000 square miles. In other words, the federal government awarded these 100 persons a federal subsistence preference to harvest a resource very important to all Alaskans within an area seven times what the new evidence could possibly support. So, you know, when you... you've emphasized that quite a bit already in your argument and also in your brief, but doesn't that area contain a lot of exclusions? In other words, this doesn't grant authority to hunt in thousands of excluded acres, right? Are you referring, your honor, to the roughly 4,000 square miles that is mostly state land? Well, plus private land. And they can't... does this authorize hunting in like national parks? Yes, it does. It does? Yes. That was covered in both the defendant's briefs and the state's reply. There is a portion that is hunted. There is a park portion of this, yes. And including the wildlife refuge? Yes. But not non-federal land, right? Not on non-federal lands, but there it gets very sticky, your honor, and we briefed this. Non-federal lands is about 40% of this area, isn't it? Roughly to the north, yes, your honor, but there are many native allotments in that area which Ms. What I'm getting at is seven times larger is really not an accurate description, is it? It is an accurate description, your honor. Why didn't they just exclude that area? Why didn't they just exclude the northern area where there was no hunting? Because it's already a game management unit and it doesn't make any difference whether it's specifically excluded because it's excluded by the regulations, right? That's very difficult to enforce on the ground, your honor. Well, I'm getting at this. I mean, you're saying, you know, per se, it's seven times larger, but you're including these excluded areas. Your honor, there are native allotments within that 4,000 square mile area sprinkled through it. Ms. Kendall Miller's clients in other litigation claim that that's federal land. There are many waterways. In the Katie John case, this court determined that where there are federal reserve water rights, there is federal subsistence jurisdiction. Where those waters are has not yet been resolved, but there are many, many waters in that area. So, on the ground, it's a very different situation. Right. How much private land is there? Not much private land throughout that area. In terms of square miles, would you estimate? State land. Well, state land, you said 4,000 square miles, right? Private land would be, I'm confident, less than 1% and probably not even close to that. So, basically, the big portion is state land? State and federal. And, well, the native allotments are private land. They're sprinkled throughout. You know, again, the boundaries are difficult to determine on the ground. Basically, the enforcement burden is thrust on the state when the federal subsistence board acts in an overbroad fashion like this. They could have just, as I pointed out earlier, there's an excerpt from the record, page 553. This entire area... Get close to the, bring it over so you're closer to the mic so we don't lose your voice. Thank you. This entire area is Unit 12, 10,000 square miles. At most, the evidence could support some harvesting in the past by residents of Chichitina or their recent ancestors in 25% of that area. Again, half of that 25% or more of it was already part of a prior CMT determination, which isn't really at issue. So, this is the area right here, this blue area. Don't be confused by the blue area over here that says Chichitina. Those are, that's harvest information right in the Chichitina area that's outside of Unit 12, and that's not an issue. So, what does the state, if the state gets its druthers, what does the state ask to be delineated as the proper boundary of the CMT for this village? The state chiefly asks that the matter be remanded to the board to make a proper determination given this court's ruling, but it would be roughly that 2,500 square miles. The state did offer... You're not trying to delineate by species, you're delineating by area, is that correct? I mean, it's moose, but... The board should have inquired into the issue of actual moose populations. If regulation's required to do so, it didn't. So, what we're stuck with is an area. The board could also examine where the populations are, but right now we're stuck with this area where there was actual prior, evidence of actual prior harvest. What authority supports the proposition that CMT determinations must be limited to the exact geography of historical hunts? There's quite a bit of... It wouldn't have to be the exact location. This 2,500 square miles is not the exact location. There's spots sprinkled, or evidence of some hunting in the past for moose sprinkled within that area. So, this 2,500 square miles is a larger than evidence-supported approximation. So, we're not talking exact to begin with. But, in terms of the support you request, I refer the court, as we did in the briefs, to 50 CFR, a board regulation, sections 100.10 and .16, talking about specific fish stocks harvested by specific local rural communities, and specific geographically-based fish stocks and wildlife populations. 50 CFR section 100.5B, which talks about those exclusive areas. And 101.16B. But, you know, these inadequacies do infirm the decision, but what would stop the agency from reaching the same conclusion on a remand? Because the agent... What's at issue is the means and methodology used by the board. These are harvest areas. They're set up as CMT harvest areas. Once there's a determination, a community is allowed to harvest within that area and have a preferential right over all other laws. And this is not based on where people eat the resource or otherwise use it, using the materials of the moose, handicrafts, or anything else. So, it should be based, and it has in the past been based on, harvest areas. The evidence is really undisputed. The fact is, that was all the evidence. Which areas of... Which exhibit is that? This is Excerpt of Record, page 53. And really, the evidence was just the spots of hunting within this 2,500-square-mile area, and really, most of it was along the Nabezna Road right here. So, with that information, which is all the information the board had, the board, in essence, if it is instructed to limit itself to the area of prior customary and traditional harvest, it will find that 2,500-square-miles or something like it. The state's concern is the over-broad use of the entire game management unit, 10,000-square-miles. That's simply arbitrary and capricious. There's no evidence to support 7,500 miles of that determination. And when you say harvest, harvest is a bureaucratic euphemism for killing, I assume, but do you mean that they would have to show that they actually took moose out, or is it enough if they were in the area hunting, but if I went out to try and find a moose, I wouldn't catch it either. So, you're talking about harvest in the sense of attempted harvest, if you will. As long as they're in the area hunting, that would suffice for a C&T determination. That's up to the board, but the board's regulations do define take as hunting. Well, hunting doesn't mean you always come back with a moose. Hunting and taking. Okay, well, I wasn't clear from the briefing whether you were arguing with that, but apparently you're not. Okay. We're talking about hunting areas. Yeah, your concern is that they not extend it well beyond any area that is geographically reasonable because it creates burdens to the state on the ground and priorities over other people. Correct. And the basic argument is those are the management concerns. That's why the state is concerned, as you put it. But really what we're looking at is APA standards. No, I understand. I'm just putting it in practical terms. I've been around long enough to know what the APA does, but I just want to figure out on the ground what we're talking about. Thank you, Your Honor. I hope you have some time for rebuttal. I'll give you a couple minutes on rebuttal. Good morning. I'm Ellen Durkee for the Federal Assistance Board. With me at council's table is Heather Kendall Miller, who represents the Chisholm Tribal Council, an intervener in this matter basically of the community of Chisholm. We plan for me to take the time for appellees unless the court has a specific question for interveners or perhaps you want to stop. All right. Thank you. The appellees contend that this court should affirm the district court's judgment and thus uphold the board's determination to expand the customary and traditional use determination for the community of Chistochina to all of game management unit 12. How can they? That's mind boggling. I'm just really troubled by the notion that although the regulation or the statute talks about use and use is the end use, it looks like. So under a theory of reading it literally, one could say that as long as a rural tribe or a village or whatever hunted within a particular area, took it away from that area, used the moose for food or crafts, brought it back to Anchorage, let us say, and sold it on the streets or used it or whatever for subsistence, they then are entitled basically to the entirety of the state because as long as they used the species, be it fish or moose in this case, as I'm reading and understanding what you're saying is that as long as they've used it and they've taken it from some part of the state, there's no geographical limitation, is there, beyond that? I'd like to answer that in two parts. One, the state has made a statutory argument at times, made it more forcefully below than the Union Appeal, and then they've also made a regulatory argument. First, if you look at the statute, there is no geographic limitation placed other than the taking has to be on federal land. Right. And the priority only extends to rural Alaska residents. Do you know whether there are, just to ask the question directly, are there any presently existing statewide CMT determinations? What the regulations say, yes, but let me explain how that works. What the regulations say is that if a CMT determination has been made for a specific species, for a specific community, other subsistence users are excluded from using that under the federal subsistence regulations. The state has sort of implied that there are CMT determinations for everything, but I think if you actually look at the regulations more closely, what you'll find is in the wildlife area is for the big game species, you know, sort of six or seven species over which there are the most conflicts. The federal subsistence taking regulations apply to many other species, such as fur-bearing animals and coyotes and, you know, smaller animals, and there are various regulations for that. There are no CMT determinations that I can see for those, and so for those kinds of species there is a statewide, you know, subsistence use. The CMT determination, I think part of it to understand sort of what its purpose is, and particularly around these big game species is, the state is trying to, I think, use it as a limitation on subsistence use hunting for the benefit of non-subsistence users and hunters. But really what it sort of developed as is sort of a zoning mechanism to, as between subsistence users so that there are not conflicts among them. Many of these native, you know, if you look back in the native traditions, there was some recognition of where people's, you know, hunting areas were, and there's some sort of cultural validation of this that's reflected in the CMT determinations so that in fact the one example that the state provided in the administrative record where the board only allowed a subunit expansion in game unit 11, in that instance the reason that they limited it was because other subsistence users in game unit 11 were opposed to it. And the record in this case is very different. The two regional councils that have jurisdiction over this area both supported this. That means that the other subsistence users also agreed and recognized this. All of the commons other than the state, from native corporations, from other subsistence committees, all supported this because all recognized that the community of Chistochina, its area as originally drawn, did not reflect what historically taken place. Well, you know, I think you're partly almost agreeing with the state's argument in this sense. One, this determination is different because it's not anchored to a traditional hunting area. And so you're saying the justification for making the area much larger, namely to include the entire game unit 12, is because nobody opposed it. Isn't that your argument? No, that's something I wanted to point out, but my argument is not that typically the board looks at only the harvest area. It is different. I mean, it seems to me historically, maybe traditionally, these C&T determinations have focused on areas that have been, you know, geographic areas that have been subject to the use. I'd like to respond to that. I don't think that is an accurate description. If you look at the regulations and what's in the record, typically, yes, there's probably evidence of harvest in the game management unit, but what the board has relied on is the game management units or subunits that have already been determined. What they have not done, and which in fact the record shows the state in the past opposed, is taking each community and, you know, making the spaghetti-shaped C&T determination for that community. There are other communities around here, Montasta or Dock Lake or Healy, and all of them have had their C&T determinations by reference to a game management unit as a whole or a subunit that had already been determined. If you went the direction the state was going, you'd have to try to figure out where the evidence of successful harvest was, and I disagree with counsel in suggesting that they are looking at where attempts were made to hunt. In fact, they are relying on evidence of successful harvests only. And you would have game management unit would just have all this overlay of different communities, and you will not find that typically in the regulations. I think if you look at the C&T determinations, you'll see a whole game management unit or a subunit, and those subunits go way back. And so what the board, I mean, what we have here is you don't have the state complaining about the validity of the regulations. You have the state agreeing that Chistichina's prior C&T determination was not accurate and that it needed to be expanded. And so you are at the most discretionary level for the board. It's really about line drawing here. Okay, but given that, I'm looking at the regulation, customary and traditional use determination, and it says one of the factors that you look at is the consistent harvest and use of fish or wildlife as related to past methods and means of taking near or reasonably accessible from the community or area. So that seems to tie it to a geographical point, the location of the subsistence user. And maybe I'm oversimplifying the argument, but what seems to be the argument by the state, as they made it today, is if you take that concept and draw some reasonable area based on past hunting, and let's take out the actual successful killing of the moose that at least they hunted in that area, I know they're conceding it, but it may be a grudging concession, but they'd say, well, there are 2,500 acres that would be within a reasonable area that would be conformity of near or reasonably accessible from the community. And your argument is, no, we could have gone to the whole GMU without any notion that they could ever possibly get to it. They're extending their priority throughout an area that is not near or reasonably accessible from their community or area. And yet FSB seems to be really reaching out to give itself the broadest power. And then the question is, well, the argument that would lead to support that would then extend essentially statewide. But you're making a leap that isn't this case. Well, I may be, but I'm just looking at the logic by which you're justifying the greater area of GMU rather than limiting it to the 2,500 acres. I mean square miles. Well, I'm going to really scale you back to acres, to heck with it. If I may respond to that, Your Honor, there are eight factors. It's very clear that the board has consistently always used them as an integrated whole. You don't have to, you know, they're not each and every one you have to meet. Seven of those factors also involve subsistence activity. Certainly hunting is a subsistence activity. Sure. So is sharing of harvest, a subsistence activity that's covered by some of these other factors. And what the record shows here is not just, it wasn't just based on where they were hunting. It also talked about the relatives that they had in other parts of the game management unit that they had social, hunting, sharing activities with. They have a tribal connection that goes back historically with other areas of the game management unit. The record, the conclusion was that the Chistochina use was no different than the other subsistence users' use of this game management unit, so there was no reason to treat them differently than the ones that already had a C&T determination. One of the problems with this map here, and I think the court caught on to some of the fuzzy math here, is that much of this northern area is state land. It is not, by definition, in the reg included. You can draw a circle around it, but it says right there in the regulation, it only applies to federal land, so that is, by definition, excluded. So the area, even the harvest, if the court is concerned that there's not enough harvest dead, there were three units here, and the evidence shows that they hunted in each and every unit. So in order to go the state direction, you are going to be foreseeing a situation where you're going to have this pattern that is not at all what has happened up to this time period. In the record, there's a letter from the state from the past saying that they objected to that kind of approach. The regulations talk in terms of making determinations by units. So I guess to sum it up, I want to make two points. One, it's not based simply on harvest. They looked at all eight factors, and if you look at those factors, there's a great deal of information there that has to do with other aspects of subsistence activities. Well, I understand that, and that's why I was starting out with the point about subsistence as the end user. It's not, and the logic of that, if you don't put some geographical limitation on it, is that if I use it in Nome, then I can go anywhere that we traditionally went to find that wildlife or fish. But if you're only looking at where they use it and how they used it, and you don't put some geographical limit on it, then it seems terribly overbroad. Now, maybe that's way too hypothetical, but my concern, I'm trying to understand here, is what limitations, because certainly a geographical limitation is one of the seven factors for sure. And I gather you're not suggesting that you can rely on all the other factors and ignore the fact that this land isn't contiguous to or reasonably accessible to, or maybe you are. In other words, let me just follow up to make it more precise. You said the sharing. If we have a history of sharing with relatives who live a thousand miles away, we make an annual trek and our families get together and we exchange goods. They exchange what they've been able to obtain. We exchange what we've been able to obtain. Are you suggesting that that exchange would allow the subsistence users here, in this case, to justify going over into the distant area where their sharing partners are and also engage in moose hunting in that area? My time is up. No, you keep going. That's flashing on me. Okay. Like I said, I think the court needs to distinguish between what the statute is requiring and what the regulation is. I know. I'm trying to… The statute does not prevent that from happening. The regulation, I mean, I don't know that I can answer that because what, you know, because you'd have to look at the specific facts of that situation and I can't answer how the board would deal with that and I don't even know if that situation even exists. But the purpose of the statute and then the regulations implemented was to preserve a way of life. It wasn't to preserve hunting grounds. It was to preserve a way of life. And so if, you know, I'm going to answer it. If the way of life, if this is, you know, completely intrinsic to it, it might, in that situation, be enough. So hunting is not what the goal of the statute was. It is a means towards an end to preserve a particular way of life. I'd like to call attention to one other point about this line drawing and whether it's too broad. I have a number of ideas here, but one that I want to make sure to call, of course, attention to. It's in the briefs. But one of the findings by the agency and, you know, to which deference is owed is that there would be no, as in their quote, no management benefit to subdividing this game management unit further. And, you know, the state sort of implies there might be, but there's no evidence to back that up. But the management is not one of the eight factors, is it? Well, I think it comes, yes. I mean, I think the record shows when in the explaining of why in some cases they have expanded C&Ts to subunits versus entire units, the staff report explains when it's done like that, that has been for a management purpose. And I think that some of that management purpose is not just wildlife management but subsistence user conflict. Well, there is that little phrase, but, you know, it's not complained or nothing cited in support of it. I mean, it's just a bald conclusion. For which? That there's no benefit in, you know, subdividing the game unit. Well, it's a conclusion made by expert federal agencies that But they don't tell you the, you know, the reasoning how they got there and, you know, what supports it. I think it's the record in this case, I think that part of it is you go back to the testimony in front of the regional councils and in front of the federal subsistence board itself. I mean, people came and testified, experts there. And so, I mean, at some level, I don't know that that should be enough, I think. And I, in terms of the, I think one of the states Maybe there's a presumption that because the state drew the line of the unit, it must be good. Well, I mean, this is part of, I think, a difficulty for the state is that they're objecting to their own lines. And, you know, the federal program, because of sort of the way it came into being, did pick this up from the state program. And it is a historical artifact of this program that it just relied on the state game management units. What you're saying is there's a reason for having game management units. Right. Which is obvious, is to improve management. I mean, that and also you might want to ask how many different kinds of configurations do you want? I mean, is it, you know, do you want to have game management units and those apply to non-subsistence users and subsistence users who choose to hunt under the state regulations? Or do you want to have, then, this federal overlay of all different things for different communities? I mean, there's a level at which the board should have discretion to decide how complicated they want to make this. And what the state is suggesting is a very complicated system. And I think it's the tenor of the state's approach here, I think this case probably does case for them, and I think it's probably the tenor of their argument, is that they are concerned about opportunities for non-subsistence users. But this statute is designed to help subsistence users. There's nothing in congressional, the congressional policy here was to help opportunities for subsistence users. And I want to put this into context of this particular community in Chistichina. There's a lot of fuzzy math going on here. 10,000 acres for the whole game management unit. 4,000 of that is excluded. Okay? So we're only talking 6,000 acres of federal land. Square miles. See, I told you. Square miles. I'm sorry. They agree that 20, there's absolutely, you know, solid evidence that 2,500 square miles that they're entitled to. So I don't know where they get the seven full. You know, I see that as 2,500 out of 6,000 square miles, and that's considerably not a seven full increase there. Secondly, the amount of the harvest here, I mean, they're talking about that they make it as just an assumption that there's going to be increased take. I hope the court understands that there is a limit on take by subsistence users under the federal regulations. There's a whole different set of regulations for take. There is a bag limit. All the different groups, the regional councils and the federal subsistence board who are familiar with this, all said this is not going to increase the take of moose. It may change where they're taking. This community, in the last, you know, the 10 years prior to this, they were taking 2.6 moose a year. I mean, we're not talking volumes and volumes of moose, but these moose are very important to this community. They are dependent on it. It's the second highest level of food consumption that this community depends on. It's a very economically depressed community. And so for that community, this opportunity is important. But in the big scheme of things, if you want to just throw out numbers to create impressions, I think it's, you know, my impression is it's somewhat of a trivial objection to having this community included. Okay, I think we have the argument. Thank you very much. You can have a couple minutes for rebuttals. A couple minutes for a rebuttal. The government ran over a bit. May it please the court. I'll try to be rapid fire at my responses. Statewide C&T determinations for coyotes and such were mentioned. This case is about the harvest of moose, an important, limited meat resource. It is not a conflict over coyotes. As to moose, the C&T determinations are exclusive throughout the state. There have been C&T determinations made virtually everywhere in the state that are exclusive to certain communities. As to subunits, the state never created portions A, B, and C. That was created by the Federal Subsistence Board within Game Management Unit 12, A for Chistochina, portion B for other communities, and C for other communities. So that's all within Game Management Unit 12. The board could have done the same thing here. If they were going to add 1,200 square miles to Chistochina, they simply could have described that area and done it like they did before. Game Management Unit 12 was not created by the state for federal subsistence harvest purposes. The federal subsistence regulations are different. The federal subsistence regulations deal with C&T determinations, which are defined as harvest areas. The state does not have that same process. The state subsistence program is based on individual need, economic need, and other factors. Game Management Unit 12 was created way before the federal subsistence program was created and was not meant for that program. So that is not a good argument, that the board should be allowed to use the entire Game Management Unit. The 1,200 added square miles that the evidence at most supported was not a record of successful hunts. It was a record of hunting sites. May have been successful, may not have been successful. And there were some assumptions made on the evidence given these sites. There weren't moose bones everywhere. The household survey information was not just of successful hunts. And this is the information that is within mostly that 1,333 square mile area that already existed as a C&T determination and which is not an issue. Those were not just successful hunts either. Those were reports by residents of Chistochina as to places they have hunted, whether they were successful or not. Subsistence can be a broader concept than harvest. But we're not talking here about preserving a way of life. The recipients of the meat can consume it in Chistochina, which is not on federal lands. So that's not the use we're talking about. They can make other products out of the moose. They can share the moose elsewhere. They can share the moose throughout Alaska and do. So we're not talking about a way of life. We're talking about the program that the federal government has implemented by regulation to prioritize and harvest the game so that it can be subsistence use. The C&T sites, areas, are harvest sites. They're not consumption sites. The only evidence in the record at most supported hunting by residents of Chistochina or their ancestors in 25% of Unit 12. You started with that, so now you're circling back, and I don't think we need any more. That argument was made, Your Honor. All right. You don't have to knock down everything. Your Honor, and again, when we talk about the bold conclusion, the bold statement that was made on the record by federal staff that there's no management benefit to restricting the hunt to a smaller area, benefit and burden. Burden to whom? Burden to the state if the area is larger than it should be. And mere administrative convenience has never been a justification for an administrative determination. Thank you all very much. All right. Thank you. It's an important issue, and we appreciate the argument. The case is submitted.
judges: Nelson, Tashima, Fisher